UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>DESMUEEK ALLEN NELSON,<br><br>Defendant. | 4:21-CR-40137-KES<br><br><br>AMENDED<br>REPORT AND RECOMMENDATION |

**INTRODUCTION**

Defendant Desmueek Allen Nelson is before the court on an indictment charging him with possession of a firearm by a felon and possession of a stolen firearm. See Docket No. 1. Mr. Nelson has filed a motion to suppress the 9 x 19 millimeter caliber semi-automatic Luger pistol and accompanying ammunition seized from his vehicle on August 11, 2021. See Docket No. 40. The United States ("government") resists the motion. See Docket No. 43. This matter has been referred to this magistrate judge for holding an evidentiary hearing and recommending a disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 57.11.

## FACTS

An evidentiary hearing was held on August 5, 2022.  Mr. Nelson was there in person along with his lawyer, Assistant Federal Public Defender Matthew Powers.  The government was represented by its Special Assistant United States Attorney, Elizabeth Ebert.  Four witnesses testified and seven exhibits were received into evidence.  From this testimony and these exhibits, the court makes the following findings of fact.

Officers connected with the Sioux Falls Area Drug Task Force, including Det. Nick Billings of the Sioux Falls Police Department, were looking for Charles Davis in unmarked vehicles on August 11, 2021, so that they could arrest him on a federal arrest warrant for drug charges.  Davis was spied exiting from a restaurant in Sioux Falls and getting in on the passenger side of a black Saturn Outlook and driving away at about 4:35 p.m. (16:35).

The officers followed the vehicle in unmarked vehicles and called in a request for a patrol car to effectuate a traffic stop of the vehicle.  Det. Billings testified that detectives' vehicles are not equipped with lights or sirens and are not rated for pursuit.  They also do not have dashcam videos and the detectives themselves do not wear body camera videos.  It is department policy for a marked patrol car to be used to effectuate traffic stops.

When Sioux Falls Police Department dispatch ("Sioux Metro") receive a call for service as dispatch received from the SFADTF on August 11, 2021, regarding the arrest of Charles Davis, all information sent by dispatch and radioed in by the officers at the call are recorded in a Command Log which

officers call a "CAD." The patrol officers who respond to the call can see the entries on the CAD and all can be updated simultaneously on developments. The government introduced print-outs of the CAD from this call as Exhibits 2 and 6. The activities of detectives at a scene are not recorded on the CAD nor are the activities of other agencies who might be present at the scene of the call such as Homeland Security.

Sioux Falls Police Officers Dat Do and Logan Gooch (who has subsequently been promoted to the rank of Detective after August 2021) responded to the call. Exh. 5 at p. 2. They located the Saturn and effectuated a traffic stop at 16:38:50 in a residential area. Exh. 3. After their arrival, four other law enforcement officers including Det. Billings arrived in unmarked vehicles but wearing clothing with insignias that identified themselves as police.

After pulling over, defendant Desmuekk Nelson, who was driving the Saturn, immediately exited his vehicle. Id. Officer Do yelled "Hey! Stay in the car! Stay in the car!" Id. at 16:38:55. Mr. Nelson ignored his commands and walked toward Officer Do. Officer Do said "Go stay in the car! Get back in the car!" Id. at 16:38:59. Mr. Nelson continued to disobey commands. Id.

Officer Do testified that he found Mr. Nelson's behavior suspicious. He testified in his experience when subjects get out of their car despite orders to stay in it that they usually are getting ready to flee or there is something inside their vehicle they do not want officers to see.

Officer Do got out of his patrol car and approached Mr. Nelson, who was standing near the driver's side door of his Saturn. Id. at 16:39:10. Officer Do walked to a location a short distance away from the Saturn and to the side and asked Mr. Nelson to come over to his location and talk to him. Id. at 16:39:22. He asked Mr. Nelson his name and Mr. Nelson identified himself as "Des" and asked what happened. Id. at 16:39:25. Officer Do explained that Mr. Nelson's passenger had a federal warrant for his arrest. Id. "For what?" Mr. Nelson asked. Id. Another officer responded, "for heroin." Id. at 16:39:30.

Officer Do asked for Mr. Nelson's identification card and Mr. Nelson responded he did not have it with him. Id. at 16:39:36. Mr. Nelson asked if he could talk to Mr. Davis "real quick." Id. at 16:39:39. He was told he could not. Id. Officer Do asked Mr. Nelson to follow him to a location on the sidewalk and to stop reaching into his pockets. Id. at 16:39:45. Instead of following Officer Do's instructions, Mr. Nelson walked over to the passenger side of his car. Id. at 16:39:56. Officer Do commanded him to stop and come onto the sidewalk. Id.

Another officer yelled at Mr. Nelson "that's how people get hurt!" Id. Mr. Nelson replied "I understand that. But I just don't understand what's going on here." Id. at 16:40:01. An officer off-screen reiterates that Mr. Davis is being arrested on a federal warrant for selling heroin and that is what is going on. Id.

Mr. Nelson has his cell phone in his hand and can be seen dialing with his thumb. Id. at 16:40:06. He states "I'm calling my girl right now, bro." Id.

at 16:40:08.  The unknown officer near Mr. Nelson tells him to put his phone away and tells him he cannot call anyone until they are done.  Id. at 16:40:11.

Officer Do obtains Mr. Nelson's first name.  Mr. Nelson keeps interjecting, asking questions about Mr. Davis like "how long you been lookin' for him for?" "I'm worried about him."  Id. at 16:40:53, 16:40:15.  Officer Do asks for Mr. Nelson's last name, whereupon Mr. Nelson volunteers he has some traffic warrants outstanding.  Id. at 16:40:19.  Officer Do obtains Mr. Nelson's date of birth.  Id. at 16:41:30.  Officer Do asked Mr. Nelson for his address and Mr. Nelson ignored him, looking at someone else and saying loudly "Bro!"  Officer Do asked again for his address and Mr. Nelson gave it.  Id. at 16:41:40.  Mr. Nelson gave his phone number in response to Officer Do's next question.  Id. at 16:41:47.

Officer Do told Mr. Nelson to hang tight while he called in the information.  Id. at 16:42:00.  Mr. Nelson immediately began asking other officers at the scene if he could talk to Mr. Davis.  Id.  He was told he could not speak to Mr. Davis right now.  Id. at 16:42:02.

Officer Do proceeded immediately to his patrol car and entered the identifying information given to him by Mr. Nelson.  Id. at 16:42:14.  One minute later Officer Do announced Mr. Nelson had a couple of local warrants for his arrest and a BOLO, which another officer explained means "be on the lookout for."  Id. at 16:43:13.  The BOLO indicated a detective wanted to speak to Mr. Nelson in connection with the theft of a firearm.  In the background, another officer admonished Mr. Nelson (again) to stay away from Mr. Davis.  Id.

at 16:44:17.  Officer Do remarked to an officer near him that he was trying to find out who the detective was who issued the BOLO for Mr. Nelson.  Id. Officer Do also learned when he ran his records check that Mr. Nelson's driver's license was suspended.

Det. Billings testified that no one on scene knew the details of the gun theft case which was the subject of the BOLO.  Therefore, it was decided that the detective who was in charge should be called.

Det. Billings testified that he had no intention of arresting Mr. Nelson for the two local warrants as they were fairly recent and traffic- or vehicle-related. Det. Billings' supervisor was also on scene and never communicated an intent to have Mr. Nelson arrested.  Officer Gooch testified officers have discretion when deciding whether to arrest a suspect they encounter on outstanding warrants.  Considerations such as the severity of the crime, the amount of the warrant, how busy the police are, and how long the warrants have been outstanding come into play in exercising that discretion.

Officer Do exited the patrol vehicle and Mr. Nelson asked if he could go. Id. at 16:45:28.  Officer Do responded not yet as there was someone he needed to call.  Id. at 16:45:29.  He then asked Mr. Nelson if there was anything in the car that police needed to know about.  Id.  Mr. Nelson responded that there was not.  Id. at 16:45:33.  Officer Do asked Mr. Nelson if they could search his car and he said "no."  Id. at 16:45:36.

Someone other than Officer Do explained to Mr. Nelson that detectives wanted to talk to him.  They said he could wait at the scene and the detectives

would come talk to him at that location, or he could submit to being arrested and could be taken down to the police station and talk to the detectives there. Id. at 16:48:05. Mr. Nelson opted to wait at the scene and talk to the detectives there. Id.

Detective Steven Redmond was at the police station that day and testified Detective Jans received a phone call about 16:45 notifying him that officers had Mr. Nelson at a traffic stop and asking if Det. Jans wanted to come speak to him pursuant to the BOLO. Det. Jans asked Det. Redmond to come with him to speak to Mr. Nelson and Det. Redmond agreed. The two left for the scene of the traffic stop immediately.

Mr. Nelson called his girlfriend and asked her to come to the scene of the traffic stop. Id. at 16:49:14 to 50:07. She agreed to come. Id. Throughout this time at the traffic stop Mr. Nelson is walking all around the scene into the street, up and down the sidewalk, walking near parked vehicles. Officers repeatedly asked him to stay on the sidewalk, but he ignored their requests. He was not handcuffed during this time. He had possession of his cell phone which he repeatedly made access to and he was never searched during this time. Officer Do testified Mr. Nelson was not free to leave, because he had to wait for the detectives to come talk to him, but he was allowed to move about at will as long as he did not approach Davis or his Saturn.

While Officer Do was dealing with Mr. Nelson, Officer Gooch approached the passenger side of the Saturn and made contact with Mr. Davis. Officer

Gooch asked Davis to step out of the car and arrested him.  Exh. 4 at 16:41:25.
Officer Gooch placed Davis in the back of his and Officer Do's patrol car.  Id.

Officers Do and Gooch left in their patrol car to take Charles Davis to jail.
Id. at 16:51:31.  Detectives Jans and Redmond arrived at about 17:00 or
17:05.  A female was at the scene in a separate vehicle when the detectives
arrived.  Det. Billings testified this was Mr. Nelson's girlfriend and she arrived
after Davis was taken to jail.  Upon her arrival, it was discovered she too had
no valid driver's license.

Mr. Nelson was seated on the curb when Detectives Jans and Redmond
arrived.  Mr. Nelson himself approached Det. Jans and Det. Redmond and said
he would like to talk to them.  Mr. Nelson was not handcuffed.  The three
discussed the gun theft for five or ten minutes on the sidewalk.

Someone at the scene called for a K-9 unit at 17:02:57.  Exh. 2 at p. 3.
Officer Grant Vanvoorst and his K-9 Hugo were out on the far west end of
Sioux Falls and they responded they would take the call.  They arrived at
17:14:02.  Id.

Det. Redmond testified that the K-9 unit arrived when they were still
speaking to Mr. Nelson.  Officer Vanvoorst first walked around the Saturn
himself in order to make sure there was nothing that would hurt Hugo.  He
then got Hugo out of the car and took him around the Saturn, the windows of
which were down.  Hugo showed some interest on the passenger side of the
vehicle, but then he alerted at the driver's side door by breathing heavily—

snorting—and by lifting a paw.  He then indicated to the presence of drugs by sitting at the driver's side door.

Officer Vanvoorst testified an "alert" behavior is not trained, it is an innate behavior a dog shows when they sense the odor of a drug.  In Hugo's case, his alert behavior consists of heavy breathing—snorting—and sometimes lifting a paw.  An "indication" is a trained behavior that a K-9 will show that affirmatively indicates the presence of the odor of a drug.  Hugo is trained to sit when he wants to indicate.

Officer Vanvoorst testified that he and Hugo have gone through a 240-hour training school together for narcotics detection.  In addition, they have completed 240 to 254 hours of additional schooling for patrol duties.  Hugo and Officer Vanvoorst also went through a certification process where they had to work in seven different scenarios to locate 14 different finds.  During training, sometimes Hugo sniffs for actual drugs, and sometimes for items that only have the odor of drugs on them such as cotton balls that have been stored with drugs.

Hugo passed this certification.  Also, Officer Vanvoorst had to successfully complete a written exam, which he did.  Hugo was last certified before the events at issue in this case on March 3, 2021.  Exh. 1.  Once certified, the certification is good for one year.  Even after being certified, Officer Vanvoorst trains with Hugo 16 hours a month, every other Wednesday.  Hugo was recertified in 2022 and is currently certified.  He is trained to detect

the odors of ecstasy, cocaine, crack cocaine, methamphetamine, heroin and black tar heroin.

After Hugo indicated, Officer Vanvoorst notified the other officers on scene. A search of Mr. Nelson's Saturn ensued and the firearm which forms the basis of the charge in this case was discovered near the driver's door of the Saturn along with some ammunition.

When Det. Jans was done talking to Mr. Nelson and while the search of the Saturn got underway, Det. Billings wrote Mr. Nelson a ticket for driving with a suspended license. This necessarily had to have occurred after Officer Vanvoorst arrived, because the search of Mr. Nelson's vehicle did not take place until after Hugo had indicated. Officer Vanvoorst arrived at 17:14:02. Therefore, the ticket Det. Billings issued, if the events occurred in the sequence described by the witnesses, had to have been issued sometime after 17:14.

When the gun was discovered, Det. Jans made phone calls to ensure that the serial number on the found gun matched the serial number of one of the guns that were stolen. When he found they matched, Mr. Nelson was arrested for possessing a stolen gun. Officer Erin Bertram was called to come to the scene and transport Mr. Nelson to jail at 17:26:26. Exh. 2 at p. 3. Officer Bertram arrived on scene at 17:37:45. Id. Mr. Nelson was pat searched incident to arrest and 3.7 grams of methamphetamine were found on his person.

Officer Vanvoorst left the scene of the traffic stop at 17:37:29. Exh. 2 at p. 3. After leaving, he completed a K-9 usage report on the use of Hugo that

day.  Exh. A.  Officer Vanvoorst testified that the time recorded on Exh. A as the "application time" was not an accurate time that Hugo actually searched. Rather, Officer Vanvoorst enters an "n" and that code tells the computer to fill in the time and date with whatever the current time and date is when Officer Vanvoorst is filling out the report.

Mr. Nelson now seeks to suppress the firearm and ammunition seized from his vehicle on the grounds that there was no probable cause for a search and, therefore, the search violated his Fourth Amendment rights.  Docket No. 40-1 at p. 4.  He also argues the firearm was not under his immediate control, that the inventory search exception to the warrant requirement is inapplicable, and that Mr. Nelson was in custody at the time his vehicle was searched.  Id. at pp. 3-6.  The government asserts the search of Mr. Nelson's vehicle was constitutional and the evidence should not be suppressed.  Docket No. 43.

### DISCUSSION

**A.    Whether the Was Search Valid Under the Automobile Exception**

The usual rule under the Fourth Amendment is that a valid search warrant supported by probable cause must first be obtained before a search is conducted.  California v. Carney, 471 U.S. 386, 390 (1985).  There are, however, a number of exceptions to the warrant requirement, including the automobile exception.  Pennsylvania v. Labron, 518 U.S. 938, 940 (1996) (per curiam); United States v. Caves, 890 F.2d 87, 89 (8th Cir. 1989).

The Supreme Court has held that the "ready mobility" of automobiles creates an exigency that allows a warrantless search of an automobile where

probable cause exists to believe that the vehicle contains contraband or evidence of criminal activity. Labron, 518 U.S. at 940; Caves, 890 F.2d at 89. Aside from the mobility of cars, the automobile exception to the warrant requirement is also supported by the fact that citizens have a reduced expectation of privacy in an automobile because automobiles are subject to pervasive regulation. Labron, 518 U.S. at 940 (citing Carney, 471 U.S. at 390-391); Caves, 890 F.2d at 89.

If probable cause exists in support of the automobile exception, the search may encompass the entire passenger compartment of the automobile, its trunk, and all containers, packages, and compartments located in the vehicle so long as there is probable cause to believe that the object of the search may be found there. Caves, 890 F.2d at 90. Probable cause requires "only a probability or substantial chance of criminal activity, not an actual showing of such activity." United States v. Neumann, 183 F.3d 753, 756 (8th Cir. 1999) (citing United States v. Payne, 119 F.3d 637, 642 (8th Cir. 1997), quoting Illinois v. Gates, 462 U.S. 213, 243-244 n.13 (1983)). Where a warrantless search occurs, the burden is on the government to show by a preponderance of the evidence that an exception to the warrant requirement applies. Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971); United States v. Kennedy, 427 F.3d 1136, 1140 (8th Cir. 2005).

An alert of a drug dog to a vehicle during a traffic stop provides probable cause to search the vehicle *if* the drug dog is reliable and the alert is reliable under the circumstances. Florida v. Harris, 568 U.S. 237, 244-46 (2013). In

12

determining whether the drug dog is reliable and whether its alert was reliable under the circumstances, courts should not apply an "inflexible" set of rigid requirements in every case, but instead should consider relevant facts under the circumstances. Id. at 246. Such factors to consider may include "evidence of a dog's satisfactory performance in a certification or training program," whether the dog "has recently and successfully completed a training program that evaluated his proficiency in locating drugs," and "evidence of the dog's (or handler's) history in the field . . . may sometimes be relevant." Id. at 246-48.

Even if the dog is shown to be generally reliable, "circumstances surrounding a particular alert may undermine the case for probable cause—if, say, the officer cued the dog (consciously or not), or if the team was working under unfamiliar conditions." Id. at 247. "The question . . . is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." Id. at 248.

Here, Hugo indicated to the driver's door area of Mr. Nelson's vehicle. The court finds from the totality of the circumstances that Hugo is reliable and that his indication under the circumstances of this case was reliable. Accordingly, that indication provided probable cause for the warrantless search under the automobile exception to the warrant requirement. Id. at 244-46.

## B.     Whether the Duration of the Traffic Stop Was Unconstitutional

Relying on Rodriguez v. United States, 575 U.S. 348 (2015), Mr. Nelson argues the police unconstitutionally prolonged the duration of the traffic stop

as a subterfuge to allow for the arrival of a drug dog.  Docket No. 40-1 at p. 4.
Under such circumstances, Mr. Nelson argues, the drug dog's alert cannot
provide probable cause for the search of the vehicle.  Id.

The government, relying on United States v. Soderman, 983 F.3d 369
(8th Cir. 2020), argues the search was valid under the automobile exception.
Docket No. 43 at pp. 13-15.  The court finds that the authorities relied on by
both parties are inapposite.

In the Soderman case, police pulled Soderman over for speeding at 7:30
in the morning.  Id. at 372.  He appeared "unkempt, had an unpleasant body
odor, and was nervously tapping his steering wheel."  Id.  He had two large
duffel bags, aftermarket wires, snacks, and energy drinks in his vehicle.  Id.
While conducting a records check, police discovered Soderman's driver's
license had been suspended.  Id. at 373.  The officer believed he observed
indicia of drug trafficking and called in a more experienced officer.  Id.
Meanwhile, Soderman called a tow truck company since he would not be
allowed to drive his vehicle.  Id.

The officer spoke to Soderman's father on the phone and the father
indicated Soderman had not "recently" been involved with drugs.  Id.  When the
officer asked Soderman, he told her he had had a drug problem in the past, but
had been "clean for years."  Id.  He did admit to smoking marijuana recently in
the vehicle while in Colorado.  Id.  The officer determined she had probable
cause to search the vehicle and called for a second tow truck.  Id.  When the
tow truck Soderman had summoned arrived, the officer sent it away.  Id.

Before the second tow truck arrived, Soderman walked away, leaving his vehicle with police.  Id.  Police then searched the vehicle and discovered drugs, a loaded firearm and a digital scale.  Id.  Soderman challenged the search of his vehicle in his subsequent federal criminal case.  Id.

The court outlined the law applicable to the duration of traffic stops:  a constitutionally permissible traffic stop (one supported by probable cause or reasonable suspicion), can violate the Fourth Amendment "when its length exceeds the time needed to attend to the stop's 'mission' and 'related safety concerns.' "  Id. at 374 (quoting Rodriguez, 575 U.S. at 354).  A traffic stop may be continued until the "tasks tied to the traffic infraction are—or reasonably should have been—completed.' "  Id. (quoting Rodriguez, 575 U.S. at 354). However, when "complications arise" in addressing the initial reasons for the traffic stop, the Fourth Amendment permits police to detain the driver "for a longer duration" than would be "strictly routine."  Id. (quoting United States v. Olivera-Mendez, 484 F.3d 505, 510 (8th Cir. 2007)).

Here, the court held there was a complication:  police discovered Soderman was not legally able to drive, there was no passenger or person close by who could drive the car, and leaving the car where it was parked posed a traffic hazard.  Id.  Accordingly, the duration of the traffic stop was permissibly extended until towing of the vehicle could occur.  Id.  The officer developed probable cause for the search during this permissible duration of the stop.  Id. Hence, the court concluded that the duration of the traffic stop did not violate Soderman's Fourth Amendment rights.

In this case, police stopped Mr. Nelson on a residential city street. His passenger, Charles Davis, could not drive the car because the passenger was himself arrested and taken into police custody. Mr. Nelson was unable to drive the vehicle because he had a suspended driver's license. Mr. Nelson called his girlfriend, who came to the site of the stop, but she too lacked a valid driver's license. But—importantly--Mr. Nelson's vehicle was never towed or impounded by the police. The court assumes that the police determined the location of the vehicle did not pose a safety hazard and left the vehicle where it was parked—next to the curb. Therefore, the complication that resulted from the fact that neither Mr. Nelson nor his girlfriend were able to legally drive the Saturn is a bit of a red herring. Police did not extend the traffic stop because they had to tow the Saturn—they never towed the vehicle at all insofar as the evidence from the hearing in this matter demonstrates.

Similarly, Mr. Nelson's reliance on Rodriguez is inapposite. In the Rodriguez case, the vehicle was stopped because the officer observed a traffic violation. Rodriguez, 575 U.S. at 350. The mission of the stop was, therefore, to issue a traffic ticket. Id. at 354. Because the police delayed the mission of issuing the traffic ticket until a drug dog could be brought to the scene without any additional reasonable suspicion to support the delay, the Court held the stop violated Rodriguez's Fourth Amendment rights. Id. at 357-58.

Here, police did not effectuate a traffic stop because they observed a traffic violation or equipment violation and they wanted to issue a traffic ticket to Mr. Nelson. Instead, Mr. Nelson's vehicle was stopped because Charles

16

Davis was seen entering the vehicle and officers wanted to execute the federal arrest warrant on Mr. Davis. This is a wholly different "mission" than the reason for the stop in Rodriguez. After the stop in this case, officers discovered the bulletin for Mr. Nelson advising that he may be armed and dangerous and was wanted for questioning regarding the theft of a 9mm handgun in February of 2021.

The government argues the existence of the BOLO as to Mr. Nelson justified his continued detention. The court agrees and finds the real reason Mr. Nelson was detained from the inception of the traffic stop until after the search of his vehicle was the BOLO. Sioux Falls Police Officers had been alerted by Det. Jans through the BOLO that Mr. Nelson was wanted for questioning in connection with a firearms theft. No officer testified that Mr. Nelson was or was going to be arrested on his outstanding warrants—Det. Billings specifically stated he had not formed any intent to arrest Mr. Nelson on those outstanding warrants. The real reason Mr. Nelson was detained was to allow Det. Jans to come to the scene and question him. The issue presented, therefore, is whether there was reasonable suspicion to delay Mr. Nelson to allow this questioning based on the BOLO issued by Det. Jans.

The court notes that the delay involved here was about 22 or 27 minutes. The traffic stop was initiated at 16:38:50 (4:38 p.m.). Det. Jans and Det. Redmond arrived on scene at 17:00 or 17:05 (5 or 5:05 p.m.)—which was 22 or 27 minutes later. The length of the delay was not significant. The K-9 arrived at 17:14:02 while the detectives were still talking to Mr. Nelson, so the K-9 sniff

17

did not cause any additional delay.  Did the BOLO provide sufficient reasonable suspicion to keep Mr. Nelson at the scene of the traffic stop for 22 to 27 minutes?  The Supreme Court has addressed this question in United States v. Hensley, 469 U.S. 221 (1985).

In Hensley, a police officer investigating an armed robbery issued a "wanted flyer" for Thomas Hensley after receiving a tip from an informant that Hensley had driven the get-away car at the robbery in a suburb of Cincinnati. Id. at 223.  The flyer described Hensley, the date and location of the robbery, and asked other departments to pick up and hold Hensley for questioning by the police if Hensley was located.  Id.  The bulletin did not describe the informant's tip the officer had received upon which he based his reasonable suspicion for issuing the bulletin.  Id.

Twelve days later, a police officer in a different Cincinnati suburb encountered Hensley driving in a vehicle with a passenger.  Id. at 223-24.  The second officer attempted to find out more information about the wanted flyer, but before he had received any additional information, he pulled Hensley's vehicle over and conducted a traffic stop.  Id. at 224.  Seeing the butt of a gun under the passenger seat, officers arrested the passenger who was known to them to be a felon.  Id. at 224-25.  The officers then searched Hensley's vehicle where two more guns were found, one in the middle of the front seat and another in a bag in the back seat.  Id.  Hensley moved to suppress the evidence obtained from the search of his vehicle arguing that police lacked reasonable suspicion to stop him.  Id. at 225.

The Sixth Circuit had held that the wanted flyer did not provide reasonable suspicion for the stop because the crime was no longer ongoing and the wanted flyer was insufficient to create reasonable suspicion that Hensley had engaged in criminal activity. Id. at 226. The Supreme Court held that a Terry stop could indeed be premised on a fully completed crime. Id. at 228. The Court held that "where police have been unable to locate a person suspected of involvement in a past crime, the ability to briefly stop that person, ask questions, or check identification in the absence of probable cause promotes the strong governmental interest in solving crimes and bringing offenders to justice." Id. at 229. The Court emphasized that where the crime being investigated involves a felony or a public safety threat, the governmental interest dictates that the "suspect be detained as promptly as possible." Id.

As to the Sixth Circuit's second objection to the Terry stop, the Court held that if one officer has reasonable suspicion and issues a wanted bulletin, other officers are entitled to rely on that bulletin in making an investigatory stop even if the officers conducting the stop do not know the details giving rise to the issuing officer's reasonable suspicion. Id. at 232-33. The Court emphasized that the officers making the stop must have objectively relied on the bulletin. Id. at 233. The Court's conclusion rested on a finding that the original wanted bulletin was based on reasonable suspicion. Id. at 233-34. See also United States v. Jacobsen, 391 F.3d 904, 906 (8th Cir. 2004) (holding an officer can rely on a wanted flyer to make a Terry stop if the flyer is shown to be based on reasonable suspicion).

19

Here, the court notes Det. Jans never testified.  Det. Redmond did not know anything about the stolen firearms case that Det. Jans was investigating. Neither did any of the other officers have any knowledge of that theft investigation.  The only testimony adduced at the hearing was that Det. Jans had issued a BOLO for Mr. Nelson.  None of the officers who testified shed any light on the underlying basis for that BOLO.

The Hensley Court discussed a prior case involving a wanted bulletin that was ultimately *not* found to rest on probable cause, Whiteley v. Warden, 401 U.S. 560 (1971).  The Court's holding in that case was that the original issuer of the wanted bulletin did not have probable cause for the defendant's arrest, so the arrest by another officer in reliance on that bulletin also lacked probable cause.  Id. at 564 and n.5.  However, if the original issuer of the bulletin *had* had probable cause, then other officers *could* rely on the bulletin and make the arrest even without knowing the details underlying the issuance of the bulletin.  Id. at 568.

The takeaway from Whiteley and Hensley is that if the issuer of a wanted bulletin has probable cause or reasonable suspicion in support of the bulletin, then other officers can rely on that bulletin to effectuate an arrest (if there is probable cause) or to effectuate a Terry stop (if there is reasonable suspicion), even if those subsequent officers are unaware of the facts giving rise to probable cause or reasonable suspicion.  Likewise, if the officer issuing the bulletin *lacks* probable cause or reasonable suspicion, the stop or arrest of the defendant by subsequent officers who rely on that bulletin is likewise invalid.

Here, the government provided the text of the BOLO regarding

Mr. Nelson:

> 10-50 on Desmueek Nelson for possible possession of stolen
> handgun.  Subj possibly stole a 9mm SCCY CPX-2 around
> 2/15/2021.  If contact is made, use caution as [Nelson] may still
> be in possession . . . 842 . . . Supp PD21-4706 as necessary if
> Desmueek is located in possession of the firearm. –D918.

See Docket No. 43 at p. 3.

The Eighth Circuit has found that some wanted bulletins are facially

valid even in the absence of any testimony about the underlying evidence giving

rise to the bulletin, such as when a bulletin is issued on sheriff's office

letterhead and stated the suspect was "traveling armed with a handgun that he

keeps in his waistband."  United States v. Halverson-Weese, 30 F.4th 760, 764-

65 (8th Cir. 2022).  The evidence in Mr. Nelson's case is similar to the wanted

bulletin discussed in Halverson-Weese.  Both bulletins warned officers that the

suspect may be armed and dangerous.  Id.  Accordingly, the court finds the

BOLO issued for Mr. Nelson facially supported a finding of reasonable

suspicion.  Id.  Therefore, under Hensley, subsequent officers were allowed to

rely on that BOLO to detain Mr. Nelson pursuant to Terry.  Id.

The court notes that even if Det. Jans had not been available to come to

the scene, or if Det. Jans  had declined to interview Mr. Nelson, the Rodriguez

case allows a traffic stop to continue until the mission of the stop is attended to

*and any related safety concerns have been addressed.*  Rodriguez, 575 U.S. at

354.

Here, because there was reasonable suspicion to believe Mr. Nelson may be dangerous and, upon his release, may have immediate access to a firearm, police would have been allowed to conduct a <u>Terry</u> frisk of the Saturn before returning Mr. Nelson to the driver's seat of that vehicle.  <u>United States v. Dabney</u>, ___ F.4th ___, No. 21-2111, 2022 WL 3051644 at *2 (8th Cir. Aug. 3, 2022) (quoting <u>Michigan v. Long</u>, 463 U.S. 1032, 1049 (1983)).  <u>See also</u> <u>United States v. Rowland</u>, 341 F.3d 774, 783 (8th Cir. 2003) (stating "it is well settled [that] a <u>Terry</u> search of a vehicle's interior is permissible even after the un-arrested occupants have been removed from the vehicle.").  Such an extension of the traffic stop, given the totality of circumstances known to police including the BOLO, is specifically contemplated by and condoned by the Court's opinion in <u>Rodriguez</u>.

The court concludes the continued detention of Mr. Nelson at the site of the traffic stop until Det. Jans could come to the scene to speak to him was not a violation of Mr. Nelson's Fourth Amendment rights.  The 22- or 27-minute investigatory detention was not an undue delay.  The delay was based upon reasonable suspicion—the BOLO.  The drug dog came during the time the detectives were speaking to Mr. Nelson, so calling for a drug dog did not further delay the detention as in the <u>Rodriguez</u> case.  Instead, in Mr. Nelson's case, the mission of the <u>Terry</u> stop was still ongoing when the dog arrived.

## C.    Was the Search Valid Under the Inventory Exception

Mr. Nelson asserts that the inventory exception to the warrant requirement does not apply in his case.  Docket No. 40-1 at pp. 4-5.  The

government did not raise and discuss the inventory exception to the warrant requirement in its brief.  See Docket No. 43.  It is the government's burden to demonstrate grounds for a lawful search when that search takes place without a warrant.  Coolidge, 403 U.S. at 454-55; Kennedy, 427 F.3d at 1140.  Because the government does not attempt to justify the search under the inventory exception, the court does not discuss that exception and views the argument as having been waived by the government.

**D.    What is the Significance of Whether the Gun was Under Mr. Nelson's Immediate Control?**

Mr. Nelson argues in his brief that the firearm discovered in his vehicle was not under his immediate control at the time of the search.  Docket No. 40-1 at p. 4.  However, he never explains how this fact impacts the legality of the search of his vehicle.  Id.

Mr. Nelson cites to Chimel v. California, 395 U.S. 752, 763 (1969), for the proposition that the firearm was not in an "area from which [he] might gain possession of a weapon."  Id.  However, the rule announced in Chimel and its progeny, New York v. Belton, 453 U.S. 454 (1981), was significantly altered by the Court's decision in Arizona v. Gant, 556 U.S. 332 (2009).  Under Gant, the Court adopted "a new, two-part rule under which an automobile search incident to a recent occupant's arrest is constitutional:  (1) if the arrestee is within reaching distance of the vehicle during the search, *or* (2) if the police have reason to believe that the vehicle contains 'evidence relevant to the crime of arrest.' "  Davis v. United States, 564 U.S. 229, 235 (2011) (emphasis added).

The government invokes the search-incident-to-arrest exception to validate the search of Mr. Nelson's vehicle.  Docket No. 43 at pp. 9-10.

Clearly, Mr. Nelson's argument is premised on the first prong of the <u>Gant</u> test—the court infers he is arguing the search of his vehicle was not justified because the firearm was not within his reach at the time of the search.  But this fact, which the court takes as true, does not obviate the second legal basis for a vehicle search following the arrest of a recent occupant set forth in <u>Gant</u>: was there reason to believe the vehicle contained evidence relevant to the arrest of either Charles Davis or Mr. Nelson, both of whom were arrested and both of whom were recent occupants of the vehicle?  Unlike the inventory search exception, the government *does* invoke the exception to the warrant requirement for search incident to arrest in order to justify the search of Mr. Nelson's case.  Docket No. 43 at pp. 9-11.

Mr. Davis was arrested for felony drug charges immediately upon being stopped at 16:41.  At the time of the search of the Saturn, Mr. Nelson *had not yet been arrested.*  Det. Billings stated that he had not made a decision to arrest Mr. Nelson for his outstanding warrants nor had his supervisor, who was also on scene.  Det. Jans did arrest Mr. Nelson on the firearms larceny offense, but not until *after* the search had occurred.  Therefore, if the search incident to arrest applies in this case at all, it must be premised on the arrest of Charles Davis as he is the only occupant of the vehicle who had been arrested at the time the search took place.

The court notes that Mr. Davis was arrested for selling heroin, that Mr. Davis and Mr. Nelson had just exited a restaurant together, and that they were traveling in Mr. Nelson's Saturn together. Furthermore, before the search took place, a drug dog both alerted and indicated to the presence of the odor of drugs in Mr. Nelson's vehicle. Under these circumstances, it was not unreasonable for police to believe the Saturn may contain evidence of Mr. Davis' crime of arrest—drug distribution. The court concludes that the search of Mr. Nelson's vehicle was valid under the second prong of <u>Gant</u> because officers had reason to believe the vehicle might contain evidence of the crime for which Mr. Davis was arrested.

Mr. Nelson argued at the suppression hearing in this matter that the search incident to arrest could not be premised on *Mr. Davis' arrest* because too long a period of time elapsed between the arrest of Mr. Davis and the search. This argument is not supported by Eighth Circuit precedent.

In <u>United States v. Farrington</u>, ___ F.4th ___, No. 21-2974, 2022 WL 3024690 at \*\*1-2 (8th Cir. Aug. 1, 2022), police seized lockboxes from Farrington's vehicle when they searched the vehicle, but did not search the lockboxes until three hours later. Farrington argued that the search of the lockboxes could only be legal if it occurred contemporaneously with the seizure of his vehicle. <u>Id.</u> The court relied on <u>United States v. Johns</u>, 469 U.S. 478 (1985), which had held that a three-day delay in between seizure by police and search did not violate the Fourth Amendment. <u>Farrington</u>, 2022 WL 3024690

at *2.  Therefore, the court upheld the three-hour delay in Farrington's case.
Id.

Here, the delay was even more *de minimus* than the three hours in the
Farrington case.  Officers arrested Mr. Davis at approximately 4:41 p.m. and
drove him to the jail at 4:51.  The vehicle was searched between 5:22 and
5:35.[1]  Therefore, the delay between arrest and search was less than one hour.
The court holds that this delay did not invalidate the search pursuant to the
second prong of the Gant test.

### E.    What is the Significance of Whether Mr. Nelson was in Custody at the Time of the Search?

Mr. Nelson asserts in his brief that he was in custody at the time officers
decided to search his vehicle.  Docket No. 40-1 at pp. 3-4.  However, he never
connects this assertion with his argument on suppression—why does the fact
that Mr. Nelson was in custody (if he was) impact the legality of his search?
This question is never answered in Mr. Nelson's brief.

At the evidentiary hearing, counsel for Mr. Nelson argued that the
significance of whether Mr. Nelson was in custody is relevant to the first prong
of the Gant search-incident-to-arrest exception.  Because he argues Mr. Nelson
was already in custody, the weapon was not within his reach and the
government cannot justify the search under the first Gant prong.  As discussed

---

[1] Those times represent the arrival of Officer Vanvoorst (with his drug dog) and
his departure from the scene.  See Exh. 2 at p. 3.  Officer Vanvoorst's dog
provided the impetus for the search and Officer Vanvoorst participated in the
subsequent search, so the search must have happened in between Officer
Vanvoorst's arrival and his departure.

in the immediately preceding section, however, there is a second prong under
Gant that has nothing to do with whether dangerous instrumentalities are
within a suspect's reach.

The government argues Mr. Nelson was not in custody at the time of the
search, but was in investigative detention. The Supreme Court in Berkemer v.
McCarty, 468 U.S. 420 (1984) addressed the issue of whether a motorist who is
the subject of a traffic stop is "in custody" for purposes of Miranda. After the
motorist is formally arrested on a traffic violation, no matter how minor, the
Court held that Miranda warnings are required. Berkemer, 468 U.S. at 434-
4335. However, during the traffic stop itself and prior to arrest, the Court held
that Miranda applies only when and if the "suspect's freedom of action is
curtailed to a 'degree associated with formal arrest.' " Id. at 440-441 (quoting
California v. Beheler, 463 U.S. 1121, 1125 (1983) (per curiam)).

The Court acknowledged that a traffic stop "significantly curtails the
'freedom of action' of the driver and the passengers" in the detained vehicle,
noting that drivers who see a policeman's signal neither feel free to ignore that
signal nor to drive away, once stopped. Id. at 436. However, a traffic stop is
generally devoid of those elements of coercion that prompted the
announcement of the rule in Miranda. Id. at 436-438. For example, the
detention is presumptively temporary and brief, with the driver being allowed to
continue on his way after a check of his license and registration and, perhaps,
the issuance of a citation. Id. at 437. Also, the interrogation takes place in
public, subject to observation by pedestrians and other vehicles, thus reducing

27

the ability of an unscrupulous policeman to "use illegitimate means to elicit self-incriminating statements and diminish[ing] the motorist's fear that, if he does not cooperate, he will be subjected to abuse." Id. at 438.  Thus, the Court concluded that the "noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for purposes of Miranda." Id. at 440.

The Berkemer Court directed courts to consider factors such as the following in determining whether a suspect at a traffic stop was "in custody" such that Miranda warnings were required:  period of time elapsed between the traffic stop and the arrest, whether the suspect was informed his detention was only temporary or that he was not under arrest, and the character and nature of the interaction between the police and the suspect at the stop.  Id. at 441-42.

The Eighth Circuit discussed the application of Berkemer to a traffic stop in United States v. Morse, 569 F.3d 882 (8th Cir. 2009).  In that case, police stopped the vehicle in which Morse was a passenger.  Id. at 883.  The driver was arrested for driving with a suspended license and the officer asked Morse to exit the vehicle so as to conduct a search of the vehicle incident to arrest. Id.  When Morse exited, the officer told Morse he was going to conduct a pat-down search and asked Morse if he had anything on his person the officer should know about.  Id.  At that point, Morse told the officer he had crack cocaine in his pocket.  Id.  Morse later moved to suppress his statement and

28

the fruits of the officer's search of his person because the interrogation by the officer was without benefit of <u>Miranda</u> warnings.  <u>Id.</u>

The district court granted the motion to suppress, declining to apply the holding of <u>Berkemer</u> because the district court held that "the questioning of [Morse] was not in connection to the reason for the stop and far exceeded a routine roadside questioning." <u>Id.</u> at 884.  The Eighth Circuit reversed, holding that <u>Berkemer</u> controlled the analysis. <u>Id.</u> at 884-85.  The court held that, under <u>Berkemer</u>, the mere fact that Morse did not feel free to leave was not determinative of whether <u>Miranda</u> warnings were required.  <u>Id.</u>  In addition, the court noted that Morse was asked only a "modest number of questions" and the facts did not establish a situation tantamount to a formal arrest.  <u>Id.</u>

In <u>United States v. Rodriguez</u>, 711, F.3d 928, 935 (8th Cir. 2013)[2], the court also found the defendant was not in custody during questioning at a traffic stop.  The facts in that case were the defendant was stopped after police observed his vehicle had no license plates and the registration had expired.  <u>Id.</u> at 933.  As the police officer approached Rodriguez's car, he saw a television and speakers in the back seat.  <u>Id.</u>  Rodriguez told the officer his driver's license was suspended, but gave him his date of birth.  <u>Id.</u>  The vehicle was not registered either to Rodriguez or his passenger.  <u>Id.</u>  The officer returned to his patrol car to run a records search, leaving the two men in Rodriguez's car.  <u>Id.</u>

---

[2] This is not the same Eighth Circuit <u>Rodriguez</u> case that was overturned by the Supreme Court in 2015 discussed in part B above.  The Supreme Court case involved Dennys Rodriguez while the 2013 Eighth Circuit case cited above concerns Roberto Rodriguez.  <u>Compare</u> <u>Rodriguez</u>, 575 U.S. at 348, <u>with</u> <u>Rodriguez</u>, 711 F.3d at 928.

While seated in his patrol car, the officer saw Rodriguez and the passenger reaching for the floorboard and looking back at the officer. Id. The records check revealed the car was registered to a third party and there was a possible felony arrest warrant outstanding for Rodriguez. Id.

Fearing for his safety, the officer called for backup. Id. When assistance arrived, the officers ordered Rodriguez out of his car. Id. The officer asked Rodriguez what he had been reaching for and Rodriguez told the officer there was a handgun in the center console. Id. The officer then handcuffed Rodriguez for officer safety, but told Rodriguez he was *not* under arrest. Id. The officer then put Rodriguez into his patrol car. Id. The officer asked Rodriguez if there was any other contraband in his car, and Rodriguez admitted there was a methamphetamine pipe under the driver's seat. Id. The second officer similarly handcuffed the passenger and placed the passenger into a separate patrol car. Id.

On appeal, Rodriguez argued he was "in custody" for purposes of Miranda as soon as the officer ordered him to exit his vehicle. Id. at 935. The issue of whether Rodriguez was "in custody" when he was handcuffed and seated in the back of the officer's patrol vehicle was not raised, briefed or argued on appeal. Id. at 935 n.2. As to the issue of whether Rodriguez was "in custody" at the moment he was ordered to exit his car, the court held he was not. Id. at 935. At that moment, the officer had legitimate concerns for his own safety because of the reach for the floorboards, the nature of the car was suspicious (no license plates and registered to a third party with different last

30

name than either Rodriguez or his passenger), and there was a possible felony warrant for Rodriguez, for whom the officer had not received any form of identification.  Id.  Under these circumstances, the court held the officer was justified under Berkemer and Terry in removing Rodriguez from the car and securing him while the officer investigated further.  Id.

Under the totality of the circumstances, the court holds that Mr. Nelson was not in custody prior to his actual arrest.  As can be seen from the videos, he exercised substantial freedom of movement.  He repeatedly disobeyed officers' instructions.  He had access to his cell phone and in fact made a call to his girlfriend.  He walked wherever he wanted except that he was not allowed to approach the Saturn or Mr. Davis.  He was not handcuffed.  He was not searched.  It is true he was not free to leave, but that temporary detention is consistent with what is allowable under Berkemer in order to complete the mission of a traffic stop.

## CONCLUSION

Based on the foregoing facts, law and analysis, this magistrate judge respectfully recommends that Mr. Nelson's motion to suppress [Docket No. 40], be denied in its entirety.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact.

31

Objections must be timely and specific in order to require de novo review by the district court.  Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED August 9, 2022, *nunc pro tunc* August 8, 2022.

BY THE COURT:

_____
VERONICA L. DUFFY
United States Magistrate Judge