UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, vs. DESMUEEK ALLEN NELSON, Defendant. | 4:21-CR-40137-KES ORDER ADOPTING REPORT AND RECOMMENDATION AS MODIFIED AND DENYING NELSON'S MOTION TO SUPPRESS |

The government charged defendant, Desmueek Allen Nelson, with two counts: Possession of a Firearm by a Prohibited Person in violation of 18 U.S.C. § 922(g)(1) and Possession of a Stolen Firearm in violation of 18 U.S.C. § 922(j). Docket 1. Nelson moves to suppress the firearm and all ammunition that officers found in his vehicle on August 11th, 2021 on the grounds that the officers' warrantless search of his car violated his Fourth Amendment rights. Docket 40 at 1; Docket 40-1 at 2.

The court referred Nelson's motion to Magistrate Judge Veronica L. Duffy under 28 U.S.C. § 636(b)(1)(B). After holding an evidentiary hearing, Magistrate Judge Duffy recommended denial of Nelson's motion to suppress. Docket 50. Nelson filed objections to the Amended Report and Recommendation. Docket 56. After a de novo review of the Amended Report and Recommendation and a review of the record, the court adopts the Amended Report and Recommendation as modified below and denies Nelson's motion to suppress.

## LEGAL STANDARD

This court's review of a magistrate judge's report and recommendation is governed by 28 U.S.C. § 636 and Rule 72 of the Federal Rules of Civil Procedure. The court reviews de novo any objections to the magistrate judge's recommendations with respect to dispositive matters that are timely made and specific. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Because motions to suppress evidence are considered dispositive matters, a magistrate judge's recommendation regarding such a motion is subject to de novo review. 28 U.S.C. § 636(b)(1); *see also United States v. Raddatz*, 447 U.S. 667, 673 (1980). In conducting a de novo review, this court may then "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); *see also United States v. Craft*, 30 F.3d 1044, 1045 (8th Cir. 1994).

## FACTS

After reviewing the transcripts of the suppression hearing and the exhibits received into evidence, the court makes the following pertinent factual findings necessary to resolve this dispute:

On August 11th, 2021, Detective Mihajlovic spotted Charles Davis leaving a restaurant and entering the passenger seat of a black Saturn Outlook. *See* Docket 55 at 5-6, 35, 87-88. Davis, a known heroin dealer, had a federal warrant out for his arrest for distributing heroin. *Id.* at 8, 102. Detective Mihajlovic called Officer Logan Gooch and Officer Dat Do to notify them of the spotting and to give real-time updates about where the vehicle traveled. *Id.* at

2

5, 35. Officer Gooch and Officer Do made a traffic stop of the vehicle on West Avenue between 37th Street and 33rd Street at approximately 4:39 p.m. *Id.* at 11, 35-37; Docket 47 at 3. Once Officers Gooch and Do pulled the car over, Officer Gooch arrested Davis at 4:39 p.m. Docket 55 at 36; Exhibit 4 at 0:51.[1] Officer Gooch placed Davis in the backseat of a police car. *See* Exhibit 4 at 3:14.

Meanwhile, Nelson, the driver of the car, left the vehicle to talk with Officer Do. Exhibit 3 at 1:00-1:10.[2] Between 4:39 p.m. and 4:42 p.m., multiple officers looked through the black car's windows and did not see anything of consequence. Exhibit 3 at 1:20-1:30; Exhibit 4 at 4:03-4:57.

Nelson voluntarily disclosed that he had a traffic warrant for his arrest, and Officer Do confirmed Nelson had two warrants when running an NCIC record search. *See* Exhibit 3 (indicating Nelson volunteered he had a warrant around 4:41 pm); Docket 55 at 11-13. Through this record search, Officer Do also discovered a "Be On the Lookout" (BOLO) request issued for Nelson. *See* Docket 55 at 14, 92. The BOLO request stated: "10-50 on Desmueek Nelson for possible possession of stolen handgun. Subj possibly stole a 9mm SCCY CPX-2 around 02/15/21. If contact is made, use caution as may still be in possession.....842.....Supp PD21-4706 as necessary if Desmueek is located in possession of the firearm." Docket 46 at 5. Officer Do then discovered Nelson had a suspended driver's license. Docket 55 at 14. Officer Do asked Nelson for

---

[1] Exhibit 4 is footage from Officer Gooch's body-worn camera. Docket 45.
[2] Exhibit 3 is footage from Officer Do's body-worn camera. Docket 45.

permission to search the vehicle, but Nelson did not consent and said "no." Exhibit 3 at 7:14-8:00.

Although no officer had placed Nelson in handcuffs or in a police car, Officer Do, Officer Gooch, and other law enforcement personnel surrounded Nelson and ordered Nelson to stand in certain places to ensure Nelson stayed away from his vehicle and Davis.[3] *See* Docket 55 at 15, 22. At 4:49 p.m., officers allowed Nelson to call his girlfriend to come pick up his car. *See id.* at 95-96; Exhibit 3 at 10:51. Officer Gooch and Do left the scene at approximately 4:51 p.m. to transport Davis to the Minnehaha County Jail. *See* Docket 55 at 17; Docket 47 at 4.

Between approximately 5:00-5:05 p.m., Detective Redmond and Detective Jans arrived on scene to speak with Nelson about the BOLO. Docket 55 at 52-53.[4] Detective Billings, another detective on scene, testified that at this point in time, Nelson was not free to go. *See id.* at 94. Indeed, another officer told Nelson that detectives wanted to talk to him, and that he could wait at the scene and the detectives would come talk to him, or he could submit to being arrested and taken to the police station to talk with them. *See* Exhibit 3 at 9:45. Nelson stayed on scene to talk with detectives. *Id.* Detective Redmond estimated that he and other detectives spoke with Nelson for about five to ten

---

[3] Several other detectives had followed the black vehicle in police department issued vehicles unfit for conducting traffic stops. *See id.* at 88-89.

[4] Other than Officer Do and Officer Gooch, none of the other law enforcement personnel wore body cameras, and thus many of the times are estimates. *See* Docket 55 at 56, 103.

4

minutes. Docket 55 at 54. Detective Billings issued a citation to Nelson for driving with a suspended license. *See* Docket 55 at 99. Although Detective Billings's testimony suggests that he issued Nelson the citation sometime after 5:10 p.m. while officers searched the car, Exhibit 5 indicates that Detective Billings issued the citation at 5:00 p.m. *Compare* Docket 55 at 99-100, *with* Docket 46 at 3-4.

Officer Grant VanVoorst, a K9 Officer, was dispatched at approximately 5:02 p.m. and arrived on scene at approximately 5:14 p.m. *See* Docket 55 at 67. Nelson's girlfriend was either already on scene or had just arrived on scene at the time Officer VanVoorst arrived. *See id.* at 68, 83. The officers needed to check whether Nelson's girlfriend had a valid driver's license, and had yet to do so by the time Officer VanVoorst arrived on scene. *See id.* Officers learned that Nelson's girlfriend lacked a valid driver's license, but the record does not reflect precisely when officers made this discovery. *See id.* at 96. "[I]mmediately" after arriving and observing officers talking with Nelson's girlfriend, Officer VanVoorst deployed his K9 dog, Hugo, around Nelson's car. *See id.* at 67, 83.

Hugo is trained to detect scents of ecstasy, meth, cocaine, crack cocaine, heroin, and black tar. *Id.* at 66. On March 3, 2021, Hugo earned a drug detection certificate, which represents that Hugo completed the certification requirements for police service. Docket 47 at 1. This certificate is good for one year. *Id; see also* Docket 55 at 65-66. Officer VanVoorst testified that to earn this certificate, a dog and the officer must go through 240 hours of mandatory training. Docket 55 at 65. In addition to the initial certification, Officer

VanVoorst and Hugo underwent weekly training. *Id.* at 66.

Officer VanVoorst testified that Hugo is specifically trained to detect odors of drugs, rather than the drugs themselves. *Id.* at 72. Thus, "if there [were] drugs in that car at any point in time, if there was drug odor in that car at the time that [Hugo] indicate[s], if the individual had touched narcotics with his hand and then touched the door, touched, the steering wheel, anything like that, that could transfer, and he could smell that." *Id.* Officer VanVoorst testified he trained Hugo to sit in order to "indicate" when Hugo detects a narcotic odor. *Id.* at 70. Hugo's sitting shows other people that "he's doing something different." *Id.*

While the record does not reflect the exact time when Officer VanVoorst sent Hugo around Nelson's black car, Officer VanVoorst's K9 Usage Report indicates that he deployed Hugo at 5:35 p.m. Docket 48 at 1. Officer VanVoorst testified that he inserted this time in the log "after [he was] done running [his] dog[,]" and that the "computer system was really slow at the time." Docket 55 at 83. He further testified that the 5:35 p.m. entry represents the time it was when he entered the time, "versus the length of time that [he] actually ran the dog." *Id.* Thus, assuming Officer VanVoorst and Hugo arrived around 5:14 p.m., Hugo walked around the car sometime between 5:14 p.m. and 5:35 p.m. After smelling around the car, Hugo sat down, indicating that he smelled the odor of a narcotic coming from inside the car. *Id.* at 71.

After Hugo indicated, officers searched the car. *See id.* at 54-55, 71-73, 96. Officers did not find any drugs inside Nelson's car. *See id.* at 72. Officers

6

did, however, discover a firearm and ammunition "in the vehicle." *Id.* at 96. The record does not indicate specifically where in the car officers located these items. Officer VanVoorst "helped search the back of the car, but [he] didn't find anything[,]" and none of the officers testified precisely where they found the firearm and ammunition. *Id.* at 55, 71-73, 96-97. Officers discovered the firearm was stolen. *See id.* at 55.

The record does not indicate whether officers called a tow truck or another one of Nelson's friends or family members to move his car, so the court assumes officers did not make further calls.

## DISCUSSION

Nelson makes several objections to Magistrate Judge Duffy's Amended Report and Recommendation related to his Fourth Amendment rights. Docket 56. First, Nelson objects to the Amended Report and Recommendation's finding "that Detective Billings wrote the ticket 'after Officer VanVoorst arrived, because the search of Mr. Nelson's vehicle did not take place until after Hugo had indicated.'" *Id.* at 11 (quoting Docket 50 at 10). Second, Nelson objects to the Amended Report and Recommendation's finding "that the indication by Officer VanVoorst's drug dog (Hugo) was reliable under the totality of the circumstances and provided probable cause for a warrantless search[.]" *Id.* Third, Nelson objects to the Amended Report and Recommendation's conclusion that "the continued detention of Mr. Nelson at the site of the traffic stop until Detective Jans could come to the scene to speak to him was not a violation of Mr. Nelson's Fourth Amendment rights[.]" *Id.* Lastly, Nelson objects

7

to the Amended Report and Recommendation's conclusion that "the arrest of Mr. Davis would allow for an exception under *Arizona v. Gant* to the Fourth Amendment requirements." *Id.*  The court addresses these objections out of order as they come up in the following discussion.

"[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *United States v. Evans*, 830 F.3d 761, 765 (8th Cir. 2016) (alteration in original) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971) (plurality opinion)). "The government bears the burden of establishing that an exception to the warrant requirement applies." *United States v. Williams*, 616 F.3d 760, 765 (8th Cir. 2010). The Amended Report and Recommendation relied on two exceptions in denying Nelson's motion to suppress: search incident to arrest and the automobile exception. Docket 50 at 11-13, 24-26.

## I.     Search Incident to Arrest

Under the search incident to arrest exception, officers may search the passenger area of the vehicle when either 1) the "arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search"; or 2) when it is "reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." *Arizona v. Gant*, 556 U.S. 332, 343 (2009); *see also United States v. Hambrick*, 630 F.3d 742, 746 (8th Cir. 2011). Here, while officers had arrested Davis before searching Nelson's car, officers

had not yet arrested Nelson. Nelson's eventual arrest cannot justify this search.

The issue is whether the search incident to arrest exception, as applied to Davis, justifies the officers' warrantless search of Nelson's car. The first prong of *Gant* does not justify such a search. At the time of the search—which officers conducted sometime between 5:14 p.m. and 5:37 p.m.—officers had already transported Davis to the Minnehaha County Jail. *See* Docket 55 at 17, 74; Docket 47 at 4. Davis was not "unsecured" or "within reaching distance of the passenger compartment at the time of the search." *Gant*, 446 U.S. at 343. *Gant's* second prong also does not justify the search. Even if it was "reasonable to believe evidence relevant to [Davis's] crime of arrest"—distribution of heroin—"might be found in the vehicle," this exception only permits officers to search the passenger area of the vehicle. *Id.* at 344 (holding second prong authorizes searches of the car when "the offense of arrest will supply a basis for searching the *passenger compartment* of an arrestee's vehicle and any containers therein." (emphasis added)); *Hambrick*, 630 F.3d at 746 ("Under *Gant*, police may search the *passenger compartment* of a vehicle incident to arrest only if . . . it is reasonable to believe the vehicle contains evidence of the offense of the arrest." (emphasis added)).

Here, the Government did not specify, nor does the record indicate, where precisely the officers located the firearm or ammunition. In fact, the limited information in the record about the location of these items hints that they were found somewhere other than the passenger compartment area: officers failed to see them after repeatedly looking through the windows of the

9

car and Officer VanVoorst did not spot the items after searching the hatchback area.[5] *See* Exhibit 3 at 1:20-1:30; Exhibit 4 at 4:03-4:57; Docket 55 at 73. To be sure, officers very well may have found them in the front seat of the car, or underneath some items in the backseat, in which case the search incident to arrest would apply. *See United States v. Thompson*, 906 F.2d 1292, 1298 (8th Cir. 1990) (" 'Passenger compartment' has been interpreted broadly by most courts . . . and generally includes whatever area is within a passenger's reach."). But the officers could have found the items under the front hood of the car, in which case the search incident to arrest would not apply. *See United States v. Barnes*, 374 F.3d 601, 604 (8th Cir. 2004) ("[A]n area that is outside any occupant's reach or that could be reached only through an elaborate dismantling of the vehicle may not be searched [incident to arrest]."). Without further testimony, the government has left the court to speculate about where officers located these items.

Because the Government bears the burden in establishing that an exception for a warrantless search applies, and because the Government has not shown that the officers found the firearm and ammunition within the passenger compartment as is required under *Gant*, the search incident to arrest exception does not justify this search. *See Williams*, 616 F.3d at 765. Insisting the Government specify precisely where officers find evidence in a

---

[5] For large SUV's, the hatchback area still counts as the passenger compartment for purposes of *Gant's* exception as long as an occupant could have reached that area while inside the vehicle. *See United States v. Stegall*, 850 F.3d 981, 985 (8th Cir. 2017).

vehicle, for purposes of the *Gant* analysis, does not just comport with the canon that the Government maintains the burden of proving a warrantless search is constitutional. It also erects guardrails in limiting *Gant's* exception: a contrary rule would incentivize the government to never disclose the location in which officers discover relevant evidence. In such a world, if officers have a reasonable belief that they could find evidence of the crime of arrest in the vehicle, *Gant's* locational limitations would be meaningless so long as the government remained silent about where officers found the evidence. In effect, defendants would have to elicit testimony to show that officers found the items *outside of* the passenger compartment—which would inappropriately reverse the burden of proof. In short, *Gant's* second prong does not apply. The court sustains Nelson's fourth objection.[6]

## II.    Automobile Exception

Although the court declines to find *Gant's* search incident to arrest exception to apply, the automobile exception provides an independent exception to the warrant requirement. *See, e.g.*, *United States v. Grooms*, 602 F.3d 939, 942 (8th Cir. 2010) ("[I]t is no longer necessary to justify the warrantless nature of the search as a search incident to arrest; rather, the warrantless search can be justified under the automobile exception."). The

---

[6] Nelson argues that "[A]ssuming Mr. Nelson's vehicle could have been searched at the time of Mr. Davis'[s] arrest, too much time had elapsed when the search was conducted, invalidating the search altogether." Docket 56 at 15. Because the court already finds the search incident to arrest exception inapplicable in this case for the above reasons, the court need not address this argument.

11

automobile exception permits warrantless searches of an automobile where there is probable cause to believe an automobile contains contraband or evidence of a crime. *See United States McGhee*, 944 F.3d 740, 742-43 (8th Cir. 2019). "Probable cause does not 'require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime.' " *Id.* at 743 (quoting *United States v. Donnelly*, 475 F.3d 946, 954 (8th Cir. 2007)).

Here, before Hugo indicated to the presence of narcotic odor in the car, the court finds that officers lacked probable cause to believe they would find evidence of contraband or of a crime in Nelson's vehicle. *See United States v. Hogan*, 25 F.3d 690, 693 (8th Cir. 1994). In *Hogan*, a confidential informant informed officers that the defendant was "selling methamphetamine and marijuana" at his workplace and that the defendant transported the drugs using a Dodge pickup truck to and from work, which began at 3:00 p.m. *See id.* at 691. Officers obtained search warrants to search the defendant's house and Dodge pickup truck. *See id.* at 691-92. At 12:40 p.m., officers spotted Hogan driving an Oldsmobile Cutlass rather than the Dodge pickup truck, but still stopped him and searched his Oldsmobile Cutlass without a warrant. *See id.* at 692. The court in *Hogan* held that the automobile exception did not apply to the Oldsmobile Cutlass, because unlike the pickup truck, the car was not named in the warrant and "[a]ll the information the agents possessed indicated that Hogan transported drugs to work in his truck and that the truck was the sole vehicle he drove to and from work." *Id.* at 693. Further, "[a]lthough the

agents believed that Hogan intended to bring drugs to work that day, they also knew that Hogan's shift began at 3:00 p.m. and that it was only 12:40 p.m. when he left the house in the Oldsmobile." *Id.* Thus, because "[a]t most, the agents had a hunch that the drugs from the house or truck might be in the Oldsmobile," the officers lacked the required probable cause to search the Oldsmobile. *See id.*

Before the dog sniff, the officers in this case faced a situation similar to that faced by the officers in *Hogan*. In fact, the officers in *Hogan* arguably had more information than officers did in this case before the dog sniff, because unlike here, the officers in *Hogan* had a warrant to search the defendant's pickup truck and home. Here, although officers had a warrant to arrest Davis for a drug distribution charge, they did not have a search warrant for any of Davis's cars. Officers also did not have any information about where Davis stored the drugs, nor which car he used to transport the drugs. The only information officers had about Nelson's car was that Davis got into it after he finished eating at a restaurant. Docket 55 at 88. Officers had no evidence linking Davis's drug distribution to Nelson's car. At best, officers had a hunch they would find Davis's drugs in Nelson's car. In conclusion, the officers here lacked probable cause—before the dog sniff—to believe they would find evidence of Davis's drugs in Nelson's car. Thus, the court must now consider whether the dog sniff, in these circumstances, gave probable cause for officers to believe they would find evidence of contraband in the car, and if so, whether officers impermissibly prolonged Nelson's detention such that the court may

13

not consider the dog sniff.

### A. Dog Sniff

A dog's indication to the presence of narcotic odor can provide officers with probable cause for officers to believe that there are drugs in the relevant area, so long as the government demonstrates the dog is reliable. *See Florida v. Harris*, 568 U.S. 237, 246-47 (2013); *see also United States v. Jackson*, 811 F.3d 1049, 1052 (8th Cir. 2016) (finding probable cause based off a dog sniff when there were sufficient facts establishing dog was reliable). Here, Officer VanVoorst testified about Hugo's initial training and continual training. *See* Docket 55 at 64-66. Specifically, Hugo completed 240 hours of training, in addition to training 16 hours a month. *See id.* at 64, 66. Hugo was certified on March 3, 2021, and the certification was valid until March 3, 2022. *See id.* at 66; Docket 47 at 1. Officer VanVoorst testified that he trained Hugo to detect odors of "ecstasy, meth, cocaine, crack cocaine, heroin, and black tar." Docket 55 at 66. And in accordance with Hugo's training, Hugo "indicated" by sitting down after sniffing around Nelson's car. *See id.* at 70-71.

Nelson argues the circumstances of this case counsel against finding Hugo's indication to be a reliable predictor that officers would find contraband in Nelson's car. *See* Docket 56 at 12. Nelson points to the fact that the "windows were down," and argues that "Officer VanVoorst's description of the dog's training and sensitivity to the presence of narcotics obfuscates the notion probable cause could be found in this case[.]" *Id.* Furthermore, Nelson emphasizes that officers found no drugs in the car. *See id.* at 12-13. Nelson

then discusses a range of possible scenarios in which well-intentioned individuals who offer car rides to folks who have touched drugs "would be subject to a probable cause search, even if the individual with the drugs had not been in the car in weeks." *Id.* at 12-13. Nelson elaborated:

> Every Uber driver in America who has 'ever' given a ride to someone with drugs in their pocket or purse would be subject to a probable cause search at any time . . . [E]very social worker, volunteer or good Samaritan who gives someone a ride, after that person had touched drugs and then touched the interior of the car, would be subject to a probable cause search . . . [E]very defense attorney who has given a client a ride to or from court could be subject to a probable cause search if their client had touched or possessed drugs.

*Id.*

It is true that Officer VanVoorst testified that if drugs had been present in "that car at any point in time," or if an "individual had touched narcotics with his hand and then touched the door," Hugo "could smell that." *See* Docket 55 at 72. It is also true that the Supreme Court in *Harris* specifically contemplated situations where circumstances surrounding a particular alert may "undermine the case for probable cause." 568 U.S. at 245-47. And the court also recognizes the policy concerns which Nelson eloquently articulates, namely, that many innocent individuals may be subject to a warrantless vehicle search if they give anyone who has had contact with drugs, at any time.

But even if Nelson's argument would cause this court to pause before finding a dog sniff alone—coming from a dog as sensitive and trained as Hugo without any corroborating evidence—was enough for probable cause, the court finds the circumstances in this case justify a finding of probable cause. Here,

15

officers observed Davis, a known heroin dealer and an individual for whom officers had a federal arrest warrant for distributing drugs, riding as a passenger in Nelson's car.  Docket 55 at 8, 102. Officers had probable cause to believe Nelson's car contained drugs that Davis distributed after Hugo indicated. Thus, the court finds Hugo's indication, in these circumstances, provided officers with probable cause to search Nelson's vehicle for drugs.[7] The court overrules Nelson's second objection.

### B. Whether officers impermissibly prolonged the stop

The court next considers whether officers improperly prolonged the stop, in which case the court may not consider Hugo's indication. Nelson argues they did. Nelson argues that Detective Billings issued Nelson a citation for driving with a suspended license at 5:00 p.m., and officers did not call for a K9 unit until 5:02 p.m. *See* Docket 56 at 13-15. Nelson argues that officers concluded the purpose of the stop—to arrest Davis, identify Nelson and perform routine traffic checks on Nelson—before Hugo had indicated the presence of narcotic odors. *See id.*

"A traffic stop constitutes a seizure under the Fourth Amendment." *United States v. Peralez*, 526 F.3d 1115, 1119 (8th Cir. 2008). Knowledge that an occupant of a vehicle has an outstanding arrest warrant justifies a traffic

---

[7] The fact that officers did not find any drugs in Nelson's car has no relevance to whether the officers' search fell under the automobile exception. *See United States v. Farnell*, 701 F.3d 256, 264 (8th Cir. 2012) ("[T]he so-called 'automobile exception' permits police to conduct a warrantless search of an automobile if, *at the time of the search*, they have probable cause to believe that the vehicle contains contraband or other evidence of a crime." (quoting *United States v. Kennedy*, 427 F.3d 1136, 1140-41 (8th Cir. 2005) (emphasis added))).

stop to arrest that individual. *See United States v. Hensley*, 469 U.S. 221, 232 (1985). "Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission[.]' " *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). (citations omitted). An officer's mission during a traffic stop also includes "ordinary inquiries incident to such a stop." *Illinois v. Caballes*, 543 U.S. 405, 408 (2005). Generally, those inquiries "involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez*, 575 U.S. at 355. Those ordinary inquiries, like enforcement of the traffic code, serve to ensure that vehicles on the road operate safely and responsibly. *Id.* Thus, a traffic stop may only last as long as necessary to achieve its permissible missions. *See id.*

Absent at least reasonable suspicion, officers "may not conduct unrelated checks that extend the stop beyond the time reasonably required to complete its original mission." *United States v. Soderman*, 983 F.3d 369, 374 (8th Cir. 2020). A dog sniff is not an ordinary inquiry incident to a traffic stop. *Rodriguez*, 575 U.S. at 355. A dog sniff serves to "detect[] evidence of ordinary criminal wrongdoing[,]" and does not serve to ensure that vehicles operate safely and responsibly on the roadways. *Id.* (quoting *Indianapolis v. Edmond*, 531 U.S. 32, 40-41 (2000)). Thus, the critical question here is whether Officer VanVoorst and K-9 Hugo's dog sniff prolonged the traffic stop by adding time to the stop. *Id.* at 357.

If the dog sniff occurred before the time that the tasks tied to the stop

17

were—or reasonably should have been—completed, then the dog sniff did not prolong the stop. If, on the other hand, Officer VanVoorst and K-9 Hugo's dog sniff occurred after the time that the tasks tied to the stop were—or reasonably should have been—completed, then the dog sniff prolonged the traffic stop and must be supported by either reasonable suspicion or probable cause. *See Soderman*, 983 F.3d at 374.

Here, officers had arrested Davis before Officer VanVoorst and Hugo had even arrived at the scene, much less completed the dog sniff routine. *Compare* Exhibit 4 at 0:51 (showing Officer Gooch arresting Davis at 4:39 p.m.), *with* Docket 47 at 4 (showing Officer VanVoorst and Hugo arriving on scene at 5:14 p.m.). The record contains conflicting evidence about when exactly Detective Billings issued Nelson's citation for driving with a suspended license. Although Detective Billings testified that he issued the citation to Nelson while officers searched Nelson's car, which would have been after 5:14 p.m., Exhibit 5 indicates that Detective Billings issued the citation at 5:00 p.m. *Compare* Docket 55 at 67, 82, 100 *with* Docket 46 at 3-4. The Amended Report and Recommendation concluded that Detective Billings,

> necessarily had to have [issued a ticket to Nelson] after Officer [VanVoorst] arrived, because the search of Mr. Nelson's vehicle did not take place until after Hugo had indicated. Officer [VanVoorst] arrived at 17:14:02. Therefore, the ticket Det. Billings issued, if the events occurred in the sequence described by the witnesses, had to have been issued sometime after 17:14.

Docket 50 at 10. Nelson objects to this conclusion. *See* Docket 56 at 11.

Although the court is inclined to credit Exhibit 5 over the memory of

18

officers (and thus believes it more likely that Detective Billings issued the citation at 5:00 p.m.), the court need not resolve this factual dispute. That is because law enforcement had a separate reason to prolong the stop other than the time it took to issue the citation. "When complications arise 'in carrying out the traffic-related purposes of the stop, . . . police may reasonably detain a driver for a longer duration than when a stop is strictly routine.' " *Soderman*, 983 F.3d at 374 (alteration in original) (quoting *United States v. Olivera-Mendez*, 484 F.3d 505, 510 (8th Cir. 2007)). Nelson's suspended license "justifiably extended the lawful scope of the traffic stop because of [Nelson's] legal inability to remove the vehicle from the scene and the consequential need for a licensed driver or a tow truck to do so." *Id.*

Here, when Officer VanVoorst arrived, other officers were talking with Nelson's girlfriend to see if she had a valid license so that she could drive Nelson's car away. *See* Docket 55 at 68, 83. Upon arriving on scene and observing this interaction, Officer VanVoorst "immediately" deployed Hugo. *See id.* at 83. Thus, even if Detective Billings issued the citation at 5:00 p.m., law enforcement's discussions with Nelson's girlfriend to determine if she could lawfully move Nelson's car—which occurred while Officer VanVoorst deployed Hugo— justified the prolongment of the stop.[8] The court overrules Nelson's first objection as moot.

---

[8] For this reason, the court need not discuss whether the BOLO for Nelson independently justified the prolongment of the stop for detectives to speak with Nelson or whether the BOLO provided sufficient grounds to deploy the dog to sniff around Nelson's car.

The record does not specify exactly when officers determined that Nelson's girlfriend did not have a valid driver's license. *See id.* at 68, 83. But even if officers made this determination before Hugo had indicated the presence of narcotic odor, a reasonable officer could have called a towing company or another family member or friend of Nelson. Officer VanVoorst and Hugo left the scene at 5:37 p.m., and Officer VanVoorst assisted in searching Nelson's vehicle after Hugo indicated. *See* Docket 47 at 4; Docket 55 at 73. Officer VanVoorst's K9 Usage Report indicates that he deployed the dog at 5:35 p.m., but Officer VanVoorst testified that he inserted the time in the report "after [he was] done running [his] dog[,]" and that the "computer system was really slow at the time." Docket 48 at 1; Docket 55 at 83. Additionally, Officer VanVoorst testified that 5:35 p.m. represents the time *at the time he entered the time*, "versus the length of time that [he] actually ran the dog." Docket 55 at 83. Thus, Officer VanVoorst's testimony clarifies that Hugo indicated *before* 5:35 p.m., meaning that at most, there were 20 minutes between the earliest time officers discovered Nelson's girlfriend did not have a driver's license and the time Hugo indicated.

The court finds that this period is a reasonable amount of time that a reasonable officer could have to wait for either a tow truck or a second family member or friend of Nelson who was properly licensed to drive. *See Rodriguez*, 575 U.S. at 349 ("Authority for the seizure ends when tasks tied to the traffic infraction are—*or reasonably should have been*—completed." (emphasis added)). The officers' discussions with Nelson's girlfriend, the time it took to

determine whether she had a valid license, and or the time it would take to have a towing company or family member or friend take Nelson's car, justified the stop's prolongment. Thus, the court may consider Hugo's indication. And as discussed above, because Hugo indicated and because Davis was a passenger in Nelson's car and a known drug dealer who had a federal arrest warrant for distributing drugs, officers had probable cause to believe they would find evidence of contraband in Nelson's car. The court overrules Nelson's third objection.

The Amended Report and Recommendation found *Soderman* to be "inapposite" because "[p]olice did not extend the traffic stop because they had to tow the Saturn–they never towed the vehicle at all insofar as the evidence from the hearing in this matter demonstrates." *See* Docket 50 at 16. Thus, the Amended Report and Recommendation concluded that "the complication that resulted from the fact that neither Mr. Nelson nor his girlfriend were able to legally drive the Saturn is a bit of a red herring." *Id.* The court disagrees. It may be true that officers did not call a tow truck or have anyone else move Nelson's car, but this observation does not resolve the matter. Instead, the issue is whether the officers' subjective reasons for prolonging a stop make such prolongment unreasonable when officers had a different objective reason that would have justified such prolongment.

Under Fourth Amendment analysis, courts must evaluate officers' actions based on what a reasonable officer could do, not what an individual officer subjectively does in an individual case. *See, e.g.*, *Brigham City v. Stuart*,

547 U.S. 398, 404 (2006) (finding officers' real motivations for entering a home to be irrelevant because "[a]n action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively*, justify [the] action.' " (alteration in original) (quoting *Scott v. United States*, 436 U.S. 128, 138 (1978))); *Devenpeck v. Alford,* 543 U.S. 146, 153 (2004) (finding no Fourth Amendment violation even when the criminal offense for which there is probable cause to arrest is not "closely related" to the offense stated by the arresting officer at the time of the arrest because "[the Supreme Court's] cases make clear that an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause."); *Whren v. United States*, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth amendment analysis."); *United States v. Fuehrer*, 844 F.3d 767, 772 (8th Cir. 2016) ("As a result, [the officer's] observation of the traffic violation based on his use of the radar gave him probable cause to stop the vehicle, and his subjective intent to detain the vehicle for a dog-sniff search is irrelevant.")

Here, even if officers subjectively prolonged the stop because of their interest in interviewing Nelson about the BOLO—and not in order to determine who could drive the car away—and even if the BOLO does not justify prolonging the stop, a reasonable officer could have prolonged the stop so that they could determine how to remove Nelson's car from the street. Officers did not violate Nelson's Fourth Amendment rights.

## CONCLUSION

The court adopts Magistrate Judge Duffy's recommendation as modified and denies Nelson's motion to suppress. Thus, it is

ORDERED that the Amended Report and Recommendation (Docket 50) denying Nelson's motion to suppress is adopted as modified by this opinion. The motion to suppress (Docket 40) is denied.

Dated October 11, 2022.

BY THE COURT:

/s/ *Karen E. Schreier*

KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE